IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED
SEP 3 0 2002
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| LESLIE MARTIN, | } | |
| Plaintiff, | } | |
| v. | } | CASE NO. CV 00-B-3203-S |
| NEXCEL SYNTHETICS, LLC, | } | |
| Defendant. | } | |

ENTERED
OCT - 2 2002

## MEMORANDUM OPINION

Currently before the court is a Motion for Summary Judgment filed by defendant Nexcel Synthetics, LLC ("defendant" or "Nexcel"). Plaintiff Leslie Martin ("plaintiff" or "Martin") asserts claims of disability discrimination, race discrimination, and reprisal pursuant the Americans With Disabilities Act of 1990, 42 U.S.C. § 12101, *et. seq.* ("ADA"), the Civil Rights Act of 1991, 42 U.S.C. § 1981, and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). Upon consideration of the record, the submission of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's motion is due to be granted.[1]

---

[1] At the conclusion of oral argument, the court informed the parties of its intention to grant summary judgment in favor of defendant. The court requested that counsel for defendant prepare a proposed memorandum opinion for the court. Although the court has made some changes to the opinion prepared by defendant's counsel, it has adopted a large part of the proposed opinion. The court is aware of the admonition of the Eleventh Circuit that district courts not delegate "the task of drafting important opinions to litigants." *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1373 n.46 (11th Cir. 1997). This is an important opinion. Before requesting a proposed opinion from defendant's counsel, the court had reached a firm decision as to the appropriate outcome. Counsel drafted the opinion according to the express instructions of the court as to its contents. These instructions were stated to defendant's counsel, with plaintiff's counsel present, following oral argument. Although largely taken from the opinion proposed by defendant's counsel, the court personally reviewed this opinion, and the opinion reflects the court's own conclusions. The court
(continued...)

1



I.  **PROCEDURAL BACKGROUND**

Plaintiff alleges three separate claims against Nexcel. (*See* Plaintiff's Second Amended Complaint ("Complaint")). First, plaintiff claims that Nexcel (a) paid him less than other employees and (b) failed to select him for training to become Chief Operator, both in violation of the ADA.[2] (Complaint ¶¶ 17, 18.) Second, plaintiff claims that Nexcel (a) hired him at a lower rate than white employees with comparable experience and qualifications and (b) failed to select him for training to be a Chief Operator because of his race, both in violation of Title VII. (*Id.* ¶¶ 23, 24.) Third, plaintiff claims that Nexcel (a) did not select him to be Chief Operator and (b) transferred him to a less desirable shift, both in retaliation for complaining about his pay and not being selected for Chief Operator training. (*Id.* ¶ 31.)

II. **SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine

---

[1](...continued)
has also personally reviewed and considered the letter from plaintiff's counsel objecting to defendant's proposed Memorandum Opinion.

[2] Plaintiff concedes that his claims under the ADA are due to be dismissed. (Plaintiff's Responsive Brief to Defendant's Motion for Summary Judgment ("Pl.'s Response") at 19.) Consequently, this opinion does not address plaintiff's ADA claims.

issue for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgement, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston,* 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

### III. FACTUAL SUMMARY[3]

#### A. Plaintiff's Background

Plaintiff is an African-American male who has been employed by Nexcel since April 2, 1999. (Complaint ¶¶ 3, 7; Pl. Depo., Ex. 4.) Prior to working at Nexcel, plaintiff worked for Stockham Valve as a machine operator from 1988 to April 1998. (Pl. Depo. at 16, 17, 19, Ex. 1 at 1.) In April 1998, Stockham Valve closed and plaintiff was laid off. (*Id.* at 19.) In June 1998, plaintiff was still unemployed and enrolled full time at Bessemer State Technical College ("Bessemer Tech") in a two year HVAC[4] program to become an HVAC technician. (*Id.* at 19-

---

[3] As required at the summary judgment stage, where evidence is disputed, this statement of facts accepts as true plaintiff's testimony. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie Pension Fund,* 17 F.3d 1386, 1400 (11th Cir. 1994).

[4] HVAC stands for heating, ventilation, and air conditioning.

3

21.) At the time plaintiff enrolled at Bessemer Tech, he was collecting unemployment and went to school full time. (*Id.* at 20, 21.) In early 1999, when plaintiff's unemployment compensation was about to end he went to the State Unemployment Office to seek employment. (*Id.* at 21-22.) The State Unemployment Office directed plaintiff to Nexcel. (*Id.* at 22.)

**B.    Nexcel**

Prior to plaintiff's employment, Nexcel operated one manufacturing facility in Birmingham, Alabama, which makes, among other things, the backing for carpets. Part of the process of manufacturing carpet backing is the extrusion of polypropylene pellets into thin fibers of yarn. (Reddy Depo. at 8; Keel Depo. at 12, 55-56.) Nexcel's extrusion machines melt and flatten polypropylene pellets into approximately 230 individual fibers that are wound around approximately 230 separate spools. (*See* Keel Depo. at 12.) Nexcel's extrusion department operates twenty-four hours a day and is divided into four shifts (A, B, C and D), with three to four employees working on each shift. (Pl. Depo. at 54; Keel Depo. at 56.) The A and C shifts work days and the B and D shifts work nights. (Pl. Depo. at 54.) During the relevant time period, an employee in the extrusion department, depending on his experience, started as a line operator trainee (or doffer) or a line operator. (Tate Depo. at 48.) Doffing is removing a full spool of fiber and starting a new spool. (Keel Depo. at 12, 13.) An employee who is hired as a doffer may be promoted to line operator upon becoming more proficient in the extrusion operation. (Tate Depo. at 48.)

In April 1999, plaintiff met with Nexcel's Human Resources Director, Melva Tate, to inquire about an opening in the extrusion department. (Pl. Depo. at 23; Tate Depo. at 1.) Plaintiff told Tate that he could only work on the night shift because he was going to school full

time at Bessemer Tech during the day. (Pl. Depo. at 24.) On April 2, 1999, Nexcel hired plaintiff as a doffer in the extrusion department on the D shift (one of the night shifts). (Pl. Depo., Ex. 4.)

Because plaintiff did not have any prior extrusion experience that Tate considered to be relevant, Tate set plaintiff's initial pay at $7.50 per hour. (Pl. Depo. at 28, Ex. 4; Tate Depo. at 28.) As with the other hourly employees on the night shifts, plaintiff was also paid a shift differential of $0.27 per hour. (Keel Depo. at 50, 69.) On May 5, 1999, plaintiff received a raise to $8.25 per hour plus his shift differential. (Pl. Depo. at 31, Ex. 5.) On July 15, 1999, after plaintiff's ninety day probationary period, he received another raise to $8.75 plus his shift differential. (Pl. Depo. at 33, 34, Ex. 6.) On October 19, 1999, Nexcel reviewed plaintiff's performance, giving plaintiff average and above average marks. (Pl. Depo. at 35, Ex. 7.) Along with this review, plaintiff received another raise to $9.25 per hour plus his shift differential. (*Id.*)

### C.   Plaintiff's HVAC Degree

While working at Nexcel, plaintiff continued to go to school full time at Bessemer Tech. In September 1999, plaintiff graduated from Bessemer Tech and in October 1999 took the HVAC exam. (Pl. Depo. at 43, 46.) Plaintiff passed the exam and became a contractor certified by the Board of Heating and Air Conditioning Contractors. (*Id.* at 46, Ex. 14 at 5.) Plaintiff told Johnny Keel, Nexcel's maintenance manager and acting plant manager, and Tate that he wanted an HVAC position in the maintenance department. (*Id.* at 43; Keel Depo. at 7, 36, 37; Tate Depo. at 39, 40.) Plaintiff also handed Keel his resume, which stated that his objective was "[t]o obtain a position as an HVAC Technician." (Pl. Depo. at 42-43, Ex. 13.) When Keel told

plaintiff that Nexcel did not have a position in the HVAC field, plaintiff told Tate that was the field he wanted to work in and that he was interviewing currently. (Keel Depo. at 37.) Keel concluded that plaintiff intended to leave Nexcel for work elsewhere. (*See* Keel Depo. at 36, 59.)

Nexcel did not have any position for an HVAC technician and had no need for a technician who specialized in HVAC. (Keel Depo. at 36, 37.) All of the maintenance technicians at Nexcel had skills in several areas so they could be used throughout the plant. (Tate Depo. at 40; Keel Depo. at 37.) According to Keel, Nexcel contracts out its HVAC work. (Keel Depo. at 37.)

### D.    Chief Operator Training

In December 1999, Nexcel decided to reorganize the extrusion department and create a new position of chief operator. The chief operator position would add a layer of management over the line operators and doffers in the extrusion department. Nexcel's plan was to select the employees in the extrusion department who it thought were qualified to be chief operator, then train all of the selected employees for approximately six weeks. (*See* Keel Depo. at 19, 20, 34, 60-61.) After the six week training program, Nexcel would test each employee who completed the training and then select the four employees with the highest test scores as chief operators for the four shifts. (*See id.* at 36.)

In December 1999, Melva Tate, Johnny Keel and the shift supervisors reviewed all of the extrusion operators and doffers at the Birmingham plant, including plaintiff, to determine which individuals were qualified for chief operator training. (*Id.* at 19, 20.) Tate and Keel decided not to select plaintiff at least in part because he had previously told them that he wanted a job as an

6

HVAC technician. (*Id.* at 36; Tate Depo. at 59-60.) Tate and Keel knew that plaintiff wanted to work as an HVAC technician, that Nexcel did not have an HVAC technician position and therefore that plaintiff would need to leave Nexcel to find a job as an HVAC technician. (Keel Depo. at 36, 37; Tate Depo. at 40, 59-60.) Tate and Keel decided they did not want to spend the time training plaintiff for chief operator when they expected that he would soon leave Nexcel for another job. (Keel Depo. at 26-27, 36; Tate Depo. at 40, 59-60.) In late January or early February 2000, plaintiff complained about Taylor being paid more than him, and about not receiving chief operator training. (Pl. Depo. at 57, 58.)

On approximately February 29, 2000, Nexcel completed the chief operator training, conducted the final testing and selected four employees to be chief operators. Along with the assignment of these employees to chief operator, Nexcel reassigned some employees to appropriately staff each shift. (Keel Depo., Ex. 9.) As part of this reorganization, Nexcel promoted plaintiff from doffer on the D (night) shift to line operator on the C (day) shift. (*Id.*, Ex. 14; Pl. Depo. at 36, Ex. 8.) Along with this promotion, plaintiff received a raise from $9.25 to $9.75 per hour (but with no shift differential). (Pl. Depo. at 36, Ex. 8.) On May 1, 2000, plaintiff received another raise to $10.00 per hour. (Pl. Depo. at 37, Ex. 9.)

## IV.  ANALYSIS OF CLAIMS

### A.  **Plaintiff's Disparate Treatment Claims Under Title VII**

Plaintiff makes two separate claims that Nexcel discriminated against him on the basis of race under Title VII. First, plaintiff claims that he was hired at a lower rate than were white employees with comparable experience and qualifications. (Complaint ¶ 23.) Second, plaintiff claims he was not selected for training to become a chief operator because of his race.

(Complaint ¶ 24.) In any action alleging disparate treatment by an employer, the plaintiff must prove that the employer acted with a discriminatory motive. *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n.15 (1977). The plaintiff may prove her claim through the introduction of direct or circumstantial evidence. *Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354, 1358 (11th Cir. 1999). Direct evidence of discrimination is "evidence which, if believed, would prove the existence of a fact [in issue] without inference or presumption." *Bass v. Bd. of County Comm'rs,* 256 F.3d 1059, 1105 (11th Cir. 2001) (citing *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1081 (11th Cir. 1990)).

Because plaintiff offers no direct evidence of discrimination, the court's analysis is governed by the familiar framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), and later refined in *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248 (1981). *See Combs v. Plantation Patterns,* 106 F.3d 1519, 1527-28 (11th Cir. 1997) (clarifying the standard to be applied under Eleventh Circuit jurisprudence). Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Burdine,* 450 U.S. at 252-53.

If the plaintiff successfully establishes a prima facie case, the burden of production shifts to the defendant "to articulate a legitimate, nondiscriminatory reason" for the employment action. *McDonnell Douglas,* 411 U.S. at 802. Defendant's burden to rebut the presumption created in such a situation is one of production rather than proof, requiring defendant to articulate a legitimate, nondiscriminatory reason for its action. *Burdine,* 450 U.S. at 257-58.

If the defendant succeeds in carrying this burden, then any "presumption of discrimination created by the *McDonnell Douglas* framework drops from the case, and the

factual inquiry proceeds to a new level of specificity." *Combs,* 106 F.3d at 1528 (quotation omitted). The plaintiff must then prove that the defendant's articulated reasons are a mere pretext for unlawful motives (i.e., discrimination). *Id.* If plaintiff does not offer evidence to allow a fact finder to disbelieve the employer's proffered explanation for its actions, defendant is entitled to summary judgment. *See Chapman v. AI Transport*, 229 F.3d 1012, 1025 n.11 (11th Cir. 2000). At all times, the plaintiff bears the burden of persuasion on the ultimate question of whether the defendant acted with an unlawful motive. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

To avoid summary judgment, plaintiff must submit sufficient nonconclusory evidence that defendant's articulated legitimate reasons were pretextual. *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1471-72 (11th Cir. 1991); *Carter v. City of Miami*, 870 F.2d 578, 585 (11th Cir. 1989). Plaintiff must put forth concrete evidence that casts sufficient doubt on defendant's proffered reasons such that a reasonable fact finder could conclude that those reasons did not actually motivate the employment decisions. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000); *Combs,* 106 F.3d at 1538; *Earley v. Champion Int'l. Corp.*, 907 F.2d 1077, 1083-84 (11th Cir. 1990).

1. Plaintiff's Initial Pay Claim.

Plaintiff alleges in his Complaint that he "was hired in at a lower rate than were white employees with comparable experience and qualifications." (Complaint ¶ 23.) Plaintiff identifies the following comparators: (1) Brian Taylor (white) and (2) Damian Pichea (white). (Pl.'s Response at 17.) Tate set plaintiff's initial pay at $7.50 per hour, (Pl. Depo. at 28, Ex. 4; Tate Depo. at 28), while setting the initial pays of Taylor and Pichea at $10.00 per hour, (Tate

Aff. ¶¶ 5, 6). Defendant's articulated explanation for the difference in pay is that plaintiff was paid less than the identified comparators because he had less relevant work experience. (*See* Tate Aff. ¶¶ 5, 6.) In order to establish pretext, plaintiff must establish that he had experience that Tate considered to be at least as desirable as the experience of Pichea or Taylor. *See Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) ("A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.").

Pichea was hired on October 26, 1999, as an extrusion operator, with an initial rate of pay of $10.00 per hour. (Tate Aff. ¶ 5.) Pichea had prior relevant work experience at Shaw Industries operating a textile winder. (Tate Aff. ¶ 5.) In an attempt to discount Pichea's experience, plaintiff argues that none of Pichea's experience would be helpful to Nexcel. (Pl.'s Response at 18.) However, according to Tate who set the starting salaries, a textile winder is very similar to the winding process at Nexcel where, after the polypropylene pellets are extruded into yarn fibers, they are wound onto numerous rolls. (Tate Aff. ¶ 5.)

Taylor was hired on October 21, 1999, as an extrusion operator, with an initial rate of pay of $10.00 per hour. (*Id.* ¶ 6.) Taylor had prior experience at C & L Plastics as an extrusion operator. (*Id.*) Although plaintiff suggests that this experience should be discounted because it was primarily in general supervision, plaintiff does concede that "there might be some argument to starting Taylor at a higher minimum hourly rate." (Pl.'s Response at 17-18.) In Tate's judgment, Taylor's experience at C & L Plastics as an extrusion operator was especially

pertinent because he believed that the machines at C & L Plastics were very similar to the those at Nexcel. (Tate Aff. ¶ 6.)

Although plaintiff argues that he "had over ten (10) years of experience operating similar machines with Stockham," (Pl.'s Response at 17), Tate testified that he did not believe that plaintiff's work experience was as pertinent to the job to be performed at Nexcel as the work experiences of Pichea and Taylor, (Tate Aff. ¶ 7). Unlike the experiences of Pichea and Taylor on machines similar to those used at Nexcel, plaintiff's work at Stockham involved using machines that made cores for a foundry. (Pl. Depo. at 18-19.) At Stockham, plaintiff's sole job involved pouring iron into a mold in order to make fittings. (Pl. Depo. at 19.) Nexcel, on the other hand, operates extrusion machines that extrude plastics into thin yarn fibers. Tate concluded that the experiences of Pichea and Taylor were more germane to the jobs to be performed at Nexcel than plaintiff's past experience. Because there is no evidence indicating that this conclusion was not reasonable or that it would not have motivated a reasonable employer to start Pichea and Taylor at higher initial wages than plaintiff, defendant is entitled to judgment as a matter of law on plaintiff's differential pay claim.

2. Selection for Chief Operator Training.

Plaintiff claims that he was not selected for training to be chief operator because of his race. (Complaint ¶ 24.) According to Tate and Keel, plaintiff was not selected for chief operator training because plaintiff had told them that he wanted to find a job using his HVAC degree. (Tate Depo. at 40, 59-60; Keel Depo. at 26-27, 36.) Because Nexcel did not have a position for an HVAC technician, Tate and Keel believed that plaintiff would look for a job at another company. (*Id.*) Tate and Keel did not want to select anyone for chief operator training,

11

including plaintiff, if they thought the employee might look for another job and thus present a retention problem. (Keel Depo. at 26-27.)

Plaintiff challenges Nexcel's articulated reason and argues that Tate told plaintiff that he was not selected for chief operating training because he had poor communication skills and "some off-handed remark regarding his education but nothing about his interest in leaving for an HVAC job." (Pl.'s Response at 14.) However, in his EEOC Charge, plaintiff stated:

> I was given three different reasons by Ms. Tate as to why I was not selected for the training of which I complain. These reasons included <u>my desire to work in the maintenance department</u>, my lack of education and her belief that my communication skills were not good.

(Pl. Depo., Ex. 16 (emphasis added); *see* Complaint ¶ 12.) Therefore, plaintiff admits that Tate told him that he was not selected for chief operating training at least in part because of his desire to work in the maintenance department. (*See id.*) Because Tate and Keel knew that plaintiff wanted to work in the maintenance department so that he could work as an HVAC technician, and that no such positions were available at Nexcel, they reasonably inferred that plaintiff would leave Nexcel to find a job as an HVAC technician. (Keel Depo. at 36, 37; Tate Depo. at 40, 59-60.)

In an attempt to establish pretext, plaintiff argues that Nexcel did not approach him to see if he wanted to be trained for chief operator or ask him if he would still leave Nexcel if he could become a chief operator. (Pl.'s Response at 18.) Because plaintiff presents no evidence that Nexcel approached anyone prior to making its selection for chief operator training, Nexcel's failure to approach plaintiff is not evidence of pretext. Plaintiff next argues that Tate stated that "only the best" employees were selected, and that some employees selected for chief operator

12

training had performance issues. (Pl.'s Response at 4.) Actually, Tate stated that the list was narrowed down by taking several factors into account, including experience, disciplinary issues and retention. (Tate Depo. at 59.) Defendant contends that plaintiff was not selected for chief operator training because of his stated desire to work as an HVAC technician. Thus, plaintiff's focus on his performance and the performance of other employees fails to address the articulated reason advanced by Nexcel.

Plaintiff gave Keel his resume in which he stated that his objective was to work as an HVAC technician. Plaintiff acknowledges that he spoke with Tate about getting an HVAC job. (Pl. Depo. at 43.) Plaintiff also acknowledges that Tate told him the reason he was not selected for chief operator training was because of plaintiff's "desire to work in the maintenance department." (Pl. Depo., Ex. 16.) Because a rational belief that an employee is or will soon seek employment elsewhere is a legitimate nondiscriminatory reason for not selecting the employee for additional job training, and plaintiff has offered insufficient evidence on which a reasonable jury could find defendant's reason to be pretext for unlawful race discrimination, defendant is entitled to judgment as a matter of law on plaintiff's disparate treatment claim that defendant failed to select him for additional training based on his race.

### B.  Plaintiff's Retaliation Claims

Plaintiff alleges (1) that he was transferred to a less desirable shift and (2) that he was denied a promotion to chief operator in retaliation for complaining to Tate about being denied training and being paid less than Taylor. (Complaint ¶¶ 30, 31.) In order to establish a prima facie case of unlawful retaliation in violation of Title VII, plaintiff must show: (1) that he engaged in statutorily protected expression; (2) that he experienced an adverse employment

action; and (3) a causal link between the protected expression and the adverse action. *See Sullivan v. Nat'l R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999) (citation omitted). Once a prima facie case has been established, the defendant must come forward with legitimate, nonretaliatory reasons for the employment action. *Id.* If the defendant offers legitimate reasons for the employment action, the burden shifts back to the plaintiff to prove that the reasons offered by the defendant are pretextual. *Id.*

1. Plaintiff Has Not Established A Prima Facie Case

Plaintiff has not produced any evidence on which a reasonable jury could find that he engaged in protected activity prior to being transferred or denied a promotion. Plaintiff cites to his deposition for evidence that he complained to Tate that he was not selected for chief operator training and that "he was not being paid as highly as his white counterparts for race-related reasons." (Pl.'s Response at 10.) Although plaintiff complained about being paid less than Taylor and not being trained for chief operator, (Pl. Depo. at 57, 58), there is no evidence that plaintiff told anyone that he believed he was being paid less or not selected for chief operator training because of "race-related" reasons. Because plaintiff testified that he simply complained about his pay and another position, plaintiff cannot establish a prima facie case of retaliation because he did not engage in protected activity.

2. Plaintiff Cannot Show That Nexcel's Articulated Reasons Are Pretextual

(a) Chief Operator Position

Even if plaintiff could establish a prima facie case, there is insufficient evidence for a jury to find that Nexcel's articulated reason for not selecting plaintiff for the chief operator position was pretext for unlawful retaliation. According to Nexcel, plaintiff was not selected for

14

chief operator because he did not go through chief operator training. (Tate Depo. at 39-42; Keel Depo. at 36-37.) In an attempt to establish pretext, plaintiff argues that when he expressed an interest in the training, "that alone eliminated any misconceptions [Tate] had about his desire to leave. Nothing would have stopped her from adding him to the training at that point." (Pl.'s Response at 14-15.) However, because plaintiff introduced no evidence that Nexcel added any employee to the training program after training had started, there is no evidence of pretext. Therefore, defendant is entitled to judgment as a matter of law on plaintiff's claim that defendant's failure to choose him for chief operator training constitutes unlawful retaliation.

    (b) Transfer to Line Operator

Plaintiff claims that Nexcel retaliated against him by transferring him to a less desirable shift. This transfer was actually a promotion from doffer to line operator with a raise from $9.25 to $9.75 per hour. Therefore, plaintiff cannot establish any adverse employment action. *See Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001) (holding that the asserted impact cannot be speculative and must have a tangible adverse effect on the plaintiff's employment).

Plaintiff claims that describing his transfer to line operator, on February 29, 2000, as a promotion with a raise is a "mischaracterization." (Pl.'s Response 10.) Plaintiff argues that his raise was "on a time line basis." (*Id.*) However, plaintiff offers no evidence that the raise he received on February 29, 2000, was not based on merit. To establish his claim, plaintiff argues that he was previously promoted on July 15, 1999, when his pay was raised from $8.25 to $8.75 per hour. (*Id.* at 2.) Plaintiff argues that he was "automatically" moved from a pay grade 2 to a pay grade 3 as an extrusion line operator. (*Id.* at 2-3.) This claim is inconsistent with the record.

15

Plaintiff's Personnel Status Change form shows that on July 15, 1999, plaintiff's Position Title remained the same - line doffer (Grade 2). (Pl. Depo., Ex. 6.) Furthermore, plaintiff's Personnel Change Form, dated February 29, 2000, states "<u>Promotion</u> to Line Operator . . . ." (Pl. Depo., Ex. 8 (emphasis added).)

Plaintiff claims that the transfer was less desirable because plaintiff went from night to day shift and, because he was also a preacher, he would not always be able to preach on Sundays. (Pl.'s Response at 6.) Plaintiff further argues that he indicated that the church was much more important to him than the $0.25 per hour raise and that "Tate was aware of this situation at the time of the shift change." (*Id.* at 14, citing Tate Depo. at 62-63.) Although plaintiff testified that prior to his employment at Nexcel, he told Tate that he needed to work night shifts in part because he was a minister and needed his Sundays free so that he could attend church, (Pl. Depo. at 77, 79), there is no evidence that Tate remembered it. When plaintiff was hired, he also told Tate that he had to work on the night shift because he was going to school full time during the day. (*Id.* at 24-25.) However, Nexcel does not allow employees to pick their shifts. (Tate Depo. at 63.) Upon being informed of the shift change, plaintiff did not complain or ask Tate to accomodate his concerns with working day shifts. (*Id.*; Pl. Depo. at 79.) In February 2000, plaintiff gave Tate no reason to believe that plaintiff would not want a raise and to be transferred to what was commonly referred to as the better shift.

Finally, plaintiff cites to certain comments made by Rom Reddy, the Chairman and CEO of Nexcel, as evidence to support his retaliation claim. (Pl.'s Response 12.) Reddy's comments, which were published in a monthly newsletter to employees, are as follows:

> There are many Nexcelites who are totally dedicated to their jobs
> and who care about their work and the company. Unfortunately,

> there are also some who are here to simply get their paycheck and who are happy to attack the company, attack its people, and even steal from the company, thereby stealing from you. They forget that the company is not some big, bad, lifeless organization, but a unique collection of people trying to earn a living by keeping customers happy. Let me say to those of you who do this: by biting the hand that feeds you, you only attack your co-workers and threaten their livelihood and yours. If you have gripes, let's hear them. If we can help, we will. Otherwise, we will tell you that we can't and let's all move on.

(Pl. Evid. Sub., Ex. 21). The court finds that this passage is insufficient to constitute pretext, especially in light of the absence of any evidence that Reddy was involved in or influenced the decisions of which plaintiff complains.[5] Therefore, defendant is entitled to judgment as a matter of law on plaintiff's retaliation claims.

## V. Conclusion

For the reasons stated herein, the court is of the opinion that Nexcel's motion for summary judgment is due to be granted. An Order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** this  30th  day of September, 2002.

*Sharon Lovelace Blackburn*
**SHARON LOVELACE BLACKBURN**
United States District Judge

---

[5] Although there are less sinister interpretations, there is a strong argument that Reddy's comments are a thinly veiled threat against employees who sue the company.

17